UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ANGIODYNAMICS, INC., | Civil Action File No. 1:22−cv−00979 (DNH/DJS) |
| Plaintiff, | |
| v. | |
| KATHRYN O'MALLEY BAILEY, | **COMPLAINT** |
| Defendant. | |

Plaintiff AngioDynamics, Inc. ("AngioDynamics" or "Plaintiff"), by and through its undersigned counsel, hereby files the following Complaint against Defendant Kathryn O'Malley Bailey ("Bailey" or "Defendant") and in support thereof avers as follows:

## INTRODUCTION

1.      AngioDynamics seeks a temporary restraining order, preliminary injunctive relief, and damages arising out of the intentional and blatant breach by Bailey of various contractual duties owed to it in connection with her prior employment.  Bailey resigned from AngioDynamics in late August of 2022, just after she was just promoted upon one year of employment with the AngioDynamics, to go work for a direct competitor, where she is selling products in precisely the same market, to the same customers and prospects, in direct violation of her employment agreements with AngioDynamics.

2.      Bailey had no prior sales experience in the medical device industry when she began employment with AngioDynamics.  AngioDynamics gave Bailey a start in the industry, introduced her to existing customers and prospects, trained her on its products and applications, provided her marketing strategies, and entrusted Bailey with its confidential business information.

3.      AngioDynamics will suffer substantial and irreparable harm if Bailey is permitted to immediately pursue and target for her new employer the very customers and prospects she

marketed to at AngioDynamics.  AngioDynamics operates in a highly competitive space, and employees such as Bailey must access and use confidential information about AngioDynamics' products, its customers, and the market during their employment with AngioDynamics.

4.     AngioDynamics seeks to protect its training, investment, goodwill, customer relationships, marketing strategies, and confidential information (including customer lists and nonpublic customer preference information) through its employment agreements.   These agreements are carefully tailored to address areas of concern in the highly competitive medical device industry.

5.     The Non-Competition Agreement for U.S. Sales Employees (the "Non-Competition Agreement") provides that for a period of 12 months after separation from employment with AngioDynamics, a former employee will not accept employment, directly or indirectly, on behalf of any Conflicting Organization (as defined therein), unless that work does not involve selling, marketing, or promoting any Conflicting Product on which the employee worked or gained Confidential Information (as defined therein) during the last 18 months of employment with AngioDynamics.  The Non-Competition Agreement further provides that the restrictions are limited to the geographic area that was covered by the employee or any geographic area where the employee provided services for the 18-month period prior to separation from employment.  A copy of the Non-Competition Agreement is attached hereto as **Exhibit A**.

6.     Similarly, the Confidentiality, Non-Solicitation, and Invention Disclosure Agreement for U.S. Employees (the "Confidentiality Agreement," and together with the Non-Competition Agreement, the "Agreements") provides that an employee will not disclose or otherwise use Confidential Information of AngioDynamics without prior written permission, which includes all trade secrets, proprietary information, know-how, and confidential information

2

disclosed to or known by the employee as a result of their employment by AngioDynamics.  A copy of the Confidentiality Agreement is attached hereto as **Exhibit B**.

7.     The Confidentiality Agreement further provides that for a period of 12 months after an employee's separation from employment, the former employee will not solicit, induce, or provide any services to any current customer or other business relation to cease doing business with AngioDynamics.

8.     The Confidentiality Agreement also provides that the departing employee will inform AngioDynamics of the identity of their new employer and of the job title and responsibilities.

9.     Bailey signed the Agreements on July 22, 2021.  In consideration for these covenants, Bailey received the benefit of employment with AngioDynamics, access to AngioDynamics' confidential information, and substantial training in the field of medical device sales including, specifically, the peripheral vascular technologies it sells to certain physician specialists.

10.    Bailey resigned in late August of 2022 to go to Inari Medical, Inc. ("Inari"), which is a direct competitor of AngioDynamics and is a Conflicting Organization under the Agreements.

11.    Inari is a competitor who manufactures and sells products that directly compete with AngioDynamics' products about which Bailey gained confidential information while employed by AngioDynamics.

12.    In her position with Inari, Bailey will be involved in marketing, selling, and promoting products that directly compete with the AngioDynamics products she previously marketed, sold, and promoted, in the same territory, and to the same contacts.  Bailey's actions thus clearly breach the explicit terms of the Agreements.

13.     If Bailey is not restrained, AngioDynamics will suffer irreparable harm as it is inevitable that Bailey will use the sensitive confidential information she learned through her employment at AngioDynamics in her position at Inari to directly compete with AngioDynamics for the same customers in the same territory, impairing AngioDynamics' customer relationships and goodwill.

## PARTIES

14.     AngioDynamics is a Delaware corporation with its principal place of business in Latham, New York.

15.     Bailey is an individual and, upon information and belief, a citizen of the State of Tennessee.

## JURISDICTION

16.     Jurisdiction is appropriate under 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000 and is between citizens of different states.

17.     Jurisdiction is also appropriate in this matter under 28 U.S.C. § 1331, as it is an action arising under the laws of the United States.

18.     This Court has personal jurisdiction over Bailey because of her consent and agreement to the exclusive jurisdiction of the state and federal courts of the State of New York for any disputes with AngioDynamics and because this suit arises out of Bailey's employment with a company with its principal place of business in New York, because of Bailey's voluntary ties and connections to the State of New York, and because the contracts at issue in this case were negotiated in New York.

## VENUE

19.     Venue is proper in this Court based on the Non-Competition and Confidentiality, Non-Solicitation, and Invention Disclosure Agreements' valid forum selection clauses, because

the conduct alleged arose in this judicial district and is injurious to AngioDynamics' operations headquartered in this District.

20.     Specifically, the Non-Competition Agreement signed by Bailey contains the following choice of law, forum, and venue provision:

> Any dispute arising under or in connection with this Agreement or related to any matter which is the subject of this Agreement shall be subject to the exclusive jurisdiction of the state and federal courts located in New York, and this Agreement shall be construed under and according to the laws of the State of New York, without regard to its conflict of laws rules.

Non-Competition Agreement, Exhibit A ¶ 4(c).

21.     The Confidentiality, Non-Solicitation, and Invention Disclosure Agreement contains the same choice of law, forum, and venue provision.  Confidentiality Agreement, Exhibit B ¶ 5(c).

**FACTS**

**ANGIODYNAMICS' HIGHLY COMPETITIVE MEDICAL DEVICE SALES BUSINESS AND BAILEY'S ROLE AS ASSOCIATE TERRITORY MANAGER**

22.     AngioDynamics is a leading provider of innovative medical devices used primarily by interventional radiologists, interventional cardiologists, and vascular surgeons for the minimally-invasive diagnosis and treatment of cancer and peripheral vascular disease.

23.     Founded in Queensbury in 1988, AngioDynamics has grown into a publicly traded, NASDAQ-listed company. AngioDynamics distinguishes itself in the medical device market as, among other things, a dynamic brand with cutting-edge technology and superior customer service. The market in which AngioDynamics competes is highly competitive and growing.

24.     AngioDynamics sells its products in the U.S. through a direct sales force, and in international markets through a combination of direct sales and distributors.

25.     Bailey received an offer to join AngioDynamics on July 15, 2021, and began working with AngioDynamics on August 2, 2021.  A copy of Bailey's offer letter is attached hereto as **Exhibit C**.

26.     Bailey had no prior medical device sales experience.  Accordingly, she was hired as an Associate Territory Manager.

27.     Bailey was not promised any promotions upon her hiring.  To the contrary, as Bailey had no prior experience, she was hired at a lower level.  However, AngioDynamics believed that Bailey had potential and believed she could succeed at AngioDynamics after substantial training and investment by AngioDynamics.

28.     Because of its significant investment in cultivating goodwill, customer lists and marketing strategies, AngioDynamics requires employees that will have access to sensitive and confidential information sign the Agreements as a condition of commencing employment.

29.     In exchange, employees like Bailey agree to, among other things: refrain from working with a Conflicting Organization and selling, marketing, or promoting a Conflicting Product on which the employee worked on or gained confidential information from AngioDynamics on for a 12 month period after leaving the company in order to protect actual or inevitable disclosure of AngioDynamics' trade secrets, goodwill, and confidential information; refrain from disclosing or otherwise using AngioDynamics' confidential information; and refrain from soliciting customers or business relations of AngioDynamics for a 12 month period after leaving the company.

30.     Bailey primarily sold the AngioVac System and AlphaVac System products, which are restorative flow therapies, but also sold AngioDynamics' thrombolytic products (Uni-Fuse, Pulse*Spray, and SpeedLyser).

31.     The AngioVac System is indicated as venous drainage cannula for the non-surgical removal of thrombi or emboli during bypass surgery.   The AlphaVac System is a first-line multipurpose mechanical aspiration device that is easy to use and safe for the removal of thromboemboli from the venous system (heart and blood vessels).

32.     These restorative flow therapy products are marketed and sold to interventional radiologists, interventional cardiologists, and cardiothoracic surgeons, along with other doctors in similar fields.

33.     Bailey had no contacts with these types of physicians and no experience marketing to them at the time she started at AngioDynamics.

34.     Bailey was hired to market AngioDynamics' products in the Memphis Region, which includes West Tennessee, central Arkansas, central to north Mississippi, and the city of Memphis, Tennessee.

35.     The market for the AngioVac System and AlphaVac System products is highly specialized and competitive.  AngioDynamics' competitiveness in the market and ability to attract and retain its customers is directly dependent on its customer relationships, goodwill, marketing strategies, and confidential business information.

36.     As Bailey did not have any medical device sales experience when she came to AngioDynamics, AngioDynamics provided her with substantial education and training about AngioDynamics' products, relevant disease states, and medical device sales techniques and strategies.

37.     Bailey did not have exposure to this type of training at any of her prior jobs.

38.     As part of her training and position, Bailey was entrusted with proprietary and confidential information regarding AngioDynamics' products, customer lists, and customer preferences.

39.     Bailey was provided by her manager with an account list and information from AngioDynamics' customer management platform, Salesforce, so she would have notes from previous territory managers regarding each physician prospect or customer.

40.     Bailey was also provided with specific contacts to sell to and additionally brought up to speed on progress by prior AngioDynamics' representatives regarding efforts to market, successful procedures, and the outcome of those cases.

41.     As a direct result of Bailey's duties with AngioDynamics, she gained access to and learned of specific customer names, contacts, and preferences.  As a result of these duties, Bailey also had intimate knowledge of the particular market in the Memphis Region for these types of products.

42.     Further, Bailey learned about AngioDynamics' future product development strategies and roadmap, all of which is sensitive confidential information and would be harmful to AngioDynamics if it were disclosed to third parties, especially any competitors.

**BAILEY AGREES TO NON-COMPETITION, CONFIDENTIALITY, AND NON-SOLICITATION OBLIGATIONS AS A CONDITION OF HER EMPLOYMENT**

43.     As noted above, AngioDynamics requires employees like Bailey who have access to highly sensitive and confidential information to agree to the terms of employment agreements prior to commencing employment with AngioDynamics.

44.     Specifically, Bailey executed the Non-Competition Agreement and the Confidentiality Agreement.

45.     Bailey executed the Non-Competition Agreement on July 22, 2022 commensurate with, and as a condition of, her new employment at AngioDynamics.

46.     In the Non-Competition Agreement, Bailey acknowledged that AngioDynamics is engaged in a highly competitive industry and has invested substantial time, money, and resources in the development and retention of its customers, accounts, and Confidential Information.  Exhibit A at ¶ 1.  Bailey further acknowledged and agreed that any and all Confidential Information and goodwill associated with any customer or account of AngioDynamics belongs exclusively to AngioDynamics.  *Id.*

47.     Bailey further acknowledged that during the course of her performing services for AngioDynamics, AngioDynamics would furnish, disclose and make available to her Confidential Information related to AngioDynamics' business and that AngioDynamics will provide her with unique and specialized training.  *Id.*

48.     Bailey also acknowledged that AngioDynamics has invested and would invest substantial time, effort, and resources into helping her develop relationships with AngioDynamics' customers and accounts.  *Id.*

49.     Bailey specifically agreed that AngioDynamics' Confidential Information included:

> all trade secrets, proprietary information, know-how, and confidential information disclosed to me or known by me as a result of my employment by AngioDynamics, not generally known in the trade or industry in which AngioDynamics is engaged, about AngioDynamics' business operations, customers, suppliers, products, processes, machines, systems, and services, including research, development, manufacturing, purchasing, finance, data processing, engineering, marketing, designs, concepts, know-how, merchandising, and selling, and corresponding information about the products, processes, machines, and services of AngioDynamics, acquired by me during my employment by AngioDynamics. The fact that information is not patentable or copyrightable shall not affect its status as Confidential Information.

Exhibit A, Definitions.

9

50.     The Non-Competition Agreement further contains a non-compete provision, providing in relevant part:

> Subsequent to Employment.  For a period of twelve (12) months after termination of my employment with AngioDynamics for any reason or without reason, I will not accept employment, directly or indirectly, on behalf of any Conflicting Organization.
>
> Notwithstanding the foregoing, I understand that I may work for a Conflicting Organization whose business is diversified, provided my work for the Conflicting Organization does not involve selling, marketing, or promoting, any Conflicting Product on which I have worked or gained Confidential Information during the last eighteen (18) months of my employment with AngioDynamics.

Exhibit A ¶ 2(b).

51.     The Non-Competition Agreement defines Conflicting Organization as "any person or organization, which is now or hereafter engaged directly or indirectly in research on or the acquisition, development, production, distribution, marketing, providing, or selling of a Conflicting Product."  Exhibit A, Definitions.

52.     Bailey further agreed that a Conflicting Product is defined as:

> any product, process, machine, or service of any person or organization other than AngioDynamics, whether now existing or hereafter developed: (a) which is identical to, substantially the same as, an adequate substitute for, resembles, or competes with a product, process, machine, system, or service upon or with which I have worked during my term of employment with AngioDynamics or about which I acquire Confidential Information; or (b) whose use or marketability could be enhanced by application to it of Confidential Information to which I shall have had access during my employment with AngioDynamics; or (c) which is (or could reasonably be anticipated to be) marketed or distributed in such a manner and in such a geographic area as to actually compete with such a product, process, machine, or service of AngioDynamics.

Exhibit A, Definitions.

53.     The Non-Competition Agreement explains that the non-compete is limited to "(i) the geographical area that, directly or indirectly, was covered by either me or by employees, distributors, agents, or representatives who reported to me at any time during the last eighteen (18)

10

months of my employment with AngioDynamics; and/or (ii) any geographical area in which I provided services, whether directly or indirectly, at any time during the last eighteen (18) months of my employment with AngioDynamics." Exhibit A ¶ 3.

54.     In short, for a year following the termination of her employment with AngioDynamics for any reason, Bailey agreed that she would not work for a Conflicting Organization where she would sell, market, or promote any Conflicting Product in the same territory she covered while at AngioDynamics.

55.     Bailey also agreed that due to the critical nature of AngioDynamics' Confidential Information and goodwill in the competitive medical device sales industry, her breach of the Non-Competition Agreement "will cause AngioDynamics material and irreparable injury and monetary damages may not be an adequate remedy for such injury. In the event of a breach or threatened breach of this Agreement, AngioDynamics may pursue any remedies at law or equity available to it, including injunctive relief." Exhibit A ¶ 4(c).

56.     In addition to the post-employment restrictions set forth above, Bailey also acknowledged the importance of AngioDynamics' confidential information, the competitive nature of the medical device sales industry, and the importance of AngioDynamics' goodwill in the separate Confidentiality Agreement, which Bailey executed on July 22, 2022.

57.     In the Confidentiality Agreement, Bailey agreed that all Confidential Information is the sole property of AngioDynamics.  Exhibit B ¶ 2(b).  She further agreed to protect AngioDynamics' Confidential Information, even after termination of her employment with the company:

> Unless I first obtain AngioDynamics' written consent, I will not disclose, use, disseminate, lecture upon, or publish Confidential Information whether or not developed by me; provided that I may disclose same for the sole purpose of carrying out my work assignments at AngioDynamics. I acknowledge that the Confidential

Information consists of AngioDynamics' trade secrets, that those trade secrets have intrinsic economic value, that AngioDynamics makes reasonable efforts to protect the secrecy of Confidential Information, and that the economic value of Confidential Information would be reduced if I were to disclose, use, disseminate, lecture upon, or publish Confidential Information without AngioDynamics' prior written consent. I agree that my obligation to maintain the confidentiality and security of Confidential Information remains even after my employment with AngioDynamics ends.

Exhibit B ¶ 2(b).

58.     Bailey further acknowledged the importance of her confidentiality obligations, agreeing that her disclosure of Confidential Information will cause AngioDynamics irreparable injury and that monetary damages will not be an adequate remedy for such injury, and that AngioDynamics may pursue any remedies at law or equity available to it, including injunctive relief.  Exhibit B ¶ 2(e).

59.     To further protect AngioDynamics' business relations, Bailey agreed to a non-solicitation provision in the Confidentiality Agreement providing that:

for a period of twelve (12) months after the termination of my employment with AngioDynamics for any reason or without reason, I will not solicit, induce, attempt to induce, appropriate, direct, or assist another to appropriate or direct, or provide any services to any current customer, supplier, licensee, or other business relation (defined as any customer, supplier, licensee, or other business relation of AngioDynamics with whom I had dealings and/or for whom I performed services at any time during the last two (2) years of my employment with AngioDynamics) to cease doing business with AngioDynamics (including, without limitation, making any negative statements or communications concerning AngioDynamics or any of its directors, officers, or employees).

Exhibit B ¶ 4(a).

60.     Due to the importance of the rights contained in the Confidentiality Agreement, Bailey agreed to reimburse AngioDynamics for all reasonable costs and expenses (including attorneys' fees) incurred by AngioDynamics in connection with the enforcement of its rights under the Agreement.  Exhibit B ¶5(c).

61.     In both Agreements, Bailey agreed to be subject to the exclusive jurisdiction of New York.  Exhibit A ¶ 4(c); Exhibit B ¶ 5(c).

62.     Without the protections of the Agreements that Bailey signed, including the post-employment restrictions on competition and solicitation, AngioDynamics would not have hired Bailey and would not have permitted her to access AngioDynamics' Confidential Information and would not have assigned her to customer accounts cultivated by AngioDynamics.

## ALMOST IMMEDIATELY AFTER BAILEY RECEIVES A PROMOTION, SHE RESIGNS AND DEPARTS FOR A COMPETITOR

63.     Bailey approached her manager, Wesley Burgess, early in her tenure at AngioDynamics regarding a promotion.  Mr. Burgess explained that he was supportive of her and would actively advocate for her to get promoted, but it is general policy at the company that new employees are not promoted until after a year of employment.

64.     Nevertheless, because Mr. Burgess was impressed with how quickly Bailey was learning the medical device sales industry, he pushed for her to get promoted as soon as possible.

65.     To that end, on July 15, 2022, less than a year after starting with the company, Bailey was offered a promotion to Territory Manager.  That promotion was effective as of August 1, 2022, and included a $10,000 increase in base salary as well as an increase of $30,000 in potential commissions.  A copy of Bailey's promotion letter is attached hereto as **Exhibit D**.

66.     However, instead of remaining with AngioDynamics after receiving a promotion, Bailey resigned to go work for Inari Medical ("Inari"), a direct competitor of AngioDynamics with products that are competitive to AngioVac System and AlphaVac System.

67.     Inari markets to the same doctors and specialists in the Memphis region that AngioDynamics does.

68.     AngioDynamics' AngioVac System and AlphaVac System and thrombolytic products treat the same conditions that Inari's FlowTriever System and ClotTriever System treat. Additionally, the products themselves are extremely similar.

69.     The AngioDynamics and Inari products both treat essentially the same disease states, have similar indications and the function of the technologies is almost the same.

70.     Indeed, CMS does not distinguish between the AngioDynamics and Inari products because they are both in the medical thrombectomy space and have the same capabilities.  The AngioVac System, the AlphaVac System and the Inari FlowTriever have a large overlap in the clinical services offered and these services, defined by ICD-10-PCS codes, are mapped to the same MS-DRGs by Medicare. Thus, where there is overlap in clinical capabilities, the devices would use the most of the same codes and would expect to be paid the same by Medicare.

71.     Particularly the AlphaVac System and Inari FlowTriever are seen as interchangeable mechanical thrombectomy devices by many physicians. The AngioVac System, which offers the ability to directly return aspirated blood to patients via and extracorporeal circuit has been in the market for several years. Recently, the Inari Flowsaver entered the market claiming to provide a similar capability of returning blood to the patient after removing thrombus.

72.     Following her resignation, AngioDynamics conducted a review of Bailey's work phone returned to her manager.

73.     Upon information and belief, Bailey had discussed her intention to resign with several AngioDynamics customers or potential customers.

74.     In fact, one of AngioDynamics' contacts actually recommended Bailey to the Inari representative.  Other AngioDynamics' contacts were also aware that she was interviewing for a role with Inari.

75.     Upon information and belief, Bailey has informed several AngioDynamics contacts of her new position with Inari since resigning.

76.     At the time of her resignation, Bailey was reluctant to disclose to Mr. Burgess and AngioDynamics where she was going, but eventually informed Mr. Burgess that she was going to Inari.

77.     When she resigned, Mr. Burgess made mention of the Agreements and she seemed to brush it off or ignore the statement, and did not engage with him in discussing it.

78.     Because Bailey has resigned, Mr. Burgess is currently covering her territory in addition to covering his managerial responsibilities, which is standard practice at AngioDynamics until an open position can be filled.

79.     Bailey's new position at Inari consists of selling a competitive product to the same accounts in the same markets that AngioDynamics trained Bailey on over the last year.

80.     In fact, Bailey was specifically aware that Inari was a direct competitor of AngioDynamics.  While at AngioDynamics, she actually developed an Inari Competitive Review to train the Mid-Atlantic region on the Inari products and how to compete with them.  That presentation was also shared with other regions at AngioDynamics.

81.     Bailey would have no knowledge of the medical devices at Inari nor the accounts or market needs if not for her unique and specialized training at AngioDynamics and access to AngioDynamics' Confidential Information.

82.     Furthermore, any client contacts or relationships that Bailey has forged with AngioDynamics' clients were made solely as a result of her training and employment with AngioDynamics.

83.     Bailey will inevitably use, if she has not already, AngioDynamics' confidential and proprietary information to the detriment of AngioDynamics' ability to compete and for the benefit of Inari, AngioDynamics' direct competitor.

84.     With Bailey's position at Inari, she is able to offer the customer the same technical experience that she did when she worked for AngioDynamics, but at AngioDynamics' expense.

85.     In Bailey's new position, she will be selling a competitive brand of medical devices and attempting to sell those devices to AngioDynamics' clients—clients that she had no knowledge of, nor could she locate publicly, but for the knowledge that she gained while working at AngioDynamics.

86.     With the AngioDynamics information that Bailey had access to, it will make it very easy for her to convert AngioDynamics' customers to Inari's competitive products.  Bailey is intimately familiar with those customers that are (1) long-standing devotedly loyal AngioDynamics customers; (2) are proverbially "on the fence;" or (3) or in the market for various options on peripheral products.  By going to work for Inari or any other competitor, Bailey already knows which AngioDynamics customers are vulnerable for attack or not worth Inari's time.

87.     Based on Bailey's integral role within the Memphis Region, she was not only intimately familiar with what AngioDynamics' future business plans were, but she was also intimately familiar with what AngioDynamics' customers' needs and future plans were.

88.     It is undeniable that, but for her employment with AngioDynamics, Bailey would not know about the niche Memphis Region for thrombectomy products, which specific customers to target, who to contact within that customer, what AngioDynamics' marketing strategies are, and how to present the products of her new employee, Inari, in a light to better position itself when compared to AngioDynamics' products.

89.     Bailey cannot disavow or otherwise ignore her knowledge of AngioDynamics' confidential, proprietary business information – information which is extremely important to AngioDynamics and which it takes great steps to protect.

90.     Bailey's employment with Inari, a direct competitor, in a near-identical position, selling near-identical products, in the precise same market to the precise same doctors, not only breaches Bailey's agreements with AngioDynamics, but also leaves AngioDynamics with the immediate prospect that its confidential and proprietary information will be inevitably used during Bailey's employment with Inari.

91.     Based upon Bailey's knowledge of AngioDynamics' marketing strategies and sales information, she can provide valuable insight to her new employer and their pre-existing customers and/or potential customers as to how to increase their market share and better position themselves against AngioDynamics, including but not limited to her knowledge of AngioDynamics' pricing for various customers.

92.     Irrespective of whether Bailey has actually disclosed, to date, any of AngioDynamics' confidential information, it is inevitable, based upon the aforementioned, that such will be disclosed and will cause AngioDynamics irreparable harm.  Even if Bailey acts with the best of intentions, she will unintentionally transmit information gained through her employment with AngioDynamics during her day to day contact with her new employer.

**ANGIODYNAMICS ATTEMPTS TO RECEIVE ASSURANCES THAT BAILEY WILL COMPLY WITH HER CONTRACTUAL OBLIGATIONS, BUT BAILEY REFUSES AND INSTEAD FALSELY ACCUSES ANGIODYNAMICS OF FRAUD**

93.     Despite being bound by the obligations of the Agreements, Bailey took a position at Inari which appears to be the exact same as her prior role at AngioDynamics, including selling almost identical products to the same customers in the same geographic location.

94.     Shortly after AngioDynamics found out that Bailey was leaving for this position at Inari despite her obligations to AngioDynamics under the Agreements, AngioDynamics contacted her to remind her about her post-employment obligations.   A copy of that correspondence is attached hereto as **Exhibit E**.

95.     Because Inari is a Conflicting Organization under the Agreements, and AngioDynamics has serious concerns about Bailey's ability to perform her job at Inari without utilizing AngioDynamics' Confidential Information or soliciting AngioDynamics' customers, AngioDynamics asked Bailey to provide the following information and assurances:

- your job title and responsibilities for Inari;
- a description of the products and therapies that you support for Inari;
- how those products and therapies relate to your AngioDynamics duties and responsibilities;
- the geographic territory you cover for Inari;
- a representation that you have returned all AngioDynamics information to AngioDynamics together with a representation that you have returned and do not have in your custody or control any documents (in any form), emails, or electronic documents that refer to, reflect, or contain AngioDynamics Confidential Information, and confirmation that you have not provided to your new employer any such information, documents, or material;
- a representation that you have had access to and knowledge of AngioDynamics Confidential Information, that you understand you are obliged to keep such information confidential and not use or disclose it, directly or indirectly, for the benefit of any third party for as long as the information remains confidential, and that you will discharge your duties on behalf of your new employer without using, disclosing, or relying upon such information; and
- a written statement identifying any AngioDynamics customers that you have communicated with since leaving AngioDynamics, and/or a written representation that you have made no such contact and intend to otherwise comply with the Non-Competition and Confidentiality Agreements.

Exhibit E at 3.

96.     However, instead of providing any of the information or any assurances that she was not and would not violate her post-employment obligations, Bailey's response was a letter

from counsel for Inari that accused AngioDynamics of promising Bailey a promotion that never materialized.  A copy of this correspondence is attached hereto as **Exhibit F**.

97.     Essentially, instead of offering any reasons why Bailey was not in violation of her post-employment obligations to AngioDynamics under the Agreements, Bailey's response created excuses and legally flawed reasons to disavow herself of the Agreements.

98.     Further, the response did not actually differentiate the products that Bailey is working on at Inari from those that she worked on at AngioDynamics, or otherwise dispel any notion that her new position is in violation of her obligations under the Agreements.

99.     In light of the foregoing, AngioDynamics will suffer immediate and irreparable harm if Bailey's actions are not temporarily, preliminarily, and permanently enjoined.

<u>**COUNT I**</u>
**<u>Breach of Contract – Non-Competition Agreement</u>**

100.     AngioDynamics incorporates by reference all allegations in the preceding paragraphs as if set forth fully herein.

101.     The Non-Competition Agreement is a valid and enforceable contract between AngioDynamics and Bailey.

102.     AngioDynamics duly performed all of its obligations under the Non-Competition Agreement.

103.     The Non-Competition Agreement precludes Bailey from, among other things:

    a.     Accepting a position with a competitor involving selling, marketing, or promoting any conflicting product on which Bailey worked during her employment with AngioDynamics for 12 months after the termination of her employment with AngioDynamics in the geographic location that she covered while at AngioDynamics; and

       b.     Disclosing or otherwise using AngioDynamics' Confidential Information.

104.    Bailey has accepted employment with Inari and will not assure AngioDynamics that she will not compete with AngioDynamics as prohibited by the Non-Competition Agreement, nor that she is working with products that are not covered by the Non-Competition Agreement.

105.    In fact, Bailey is working for a Conflicting Organization on a Conflicting Product, as defined in the Non-Competition Agreement.

106.    As a consequence of Bailey's breach of her obligations under the Non-Competition Agreement, AngioDynamics will suffer irreparable harm and other loss.

107.    AngioDynamics is entitled to damages and a declaratory judgment upholding the terms of the Non-Competition Agreement and requiring Bailey to comply with same.  The period for compliance with the Non-Competition Agreement should further be tolled, pursuant to the doctrine of equitable tolling, while Bailey has been non-compliant.

<u>**COUNT II**</u>
<u>**Breach of Contract – Confidentiality Agreement**</u>

108.    AngioDynamics incorporates by reference all allegations in the preceding paragraphs as if set forth fully herein.

109.    The Confidentiality Agreement is a valid and enforceable contract between AngioDynamics and Bailey.

110.    AngioDynamics duly performed all of its obligations under the Confidentiality Agreement.

111.    The Confidentiality Agreement precludes Bailey from, among other things:

       a.     Disclosing or otherwise using AngioDynamics' Confidential Information without AngioDynamics' prior written consent; and

b. Soliciting, inducing, or otherwise providing any services to any current customer or other business relation to cease doing business with AngioDynamics for 12 months following termination of employment with AngioDynamics.

112. Bailey has accepted employment with Inari and will not assure AngioDynamics that she will not solicit AngioDynamics' business relations as prohibited by the Confidentiality Agreement, nor that she will refrain from using AngioDynamics' Confidential Information in her work for Inari.

113. In fact, Bailey will necessarily be soliciting AngioDynamics' business relations, as she is working on near identical products that are sold to the same customers in the same geographic area, in direct contravention of the terms of the Confidentiality Agreement.

114. As a consequence of Bailey's breach of her obligations under the Confidentiality Agreement, AngioDynamics will suffer irreparable harm and other loss.

115. AngioDynamics is entitled to damages and a declaratory judgment upholding the terms of the Confidentiality Agreement and requiring Bailey to comply with same.  The period for compliance with the Confidentiality Agreement should further be tolled, pursuant to the doctrine of equitable tolling, while Bailey has been non-compliant.

## **PRAYER FOR RELIEF**

**WHEREFORE**, AngioDynamics respectfully requests that this Court award the following relief:

(a) Temporary, preliminary and permanent orders prohibiting Bailey from working at Inari for at least 12 months, and from using or disclosing AngioDynamics' Confidential Information for the benefit of anyone other than AngioDynamics;

(b) Temporary, preliminary and permanent orders restraining and enjoining Bailey from soliciting any of AngioDynamics' customers or business

21

relations for her own benefit or for that of any competitor of AngioDynamics, including but not limited to Inari, for at least twelve months from the date of his separation from AngioDynamics;

(c)    Other equitable relief, including without limitation a constructive trust on all of Bailey's improper earnings, and unjust enrichment and reasonable royalty damages resulting from Bailey's wrongful use of AngioDynamics' Confidential Information;

(d)    Preliminary and permanent relief ordering Bailey, under penalty of perjury, to identify in writing all individuals and/or entities with whom she has shared any of AngioDynamics' information, data, or documents since her resignation from AngioDynamics, including but not limited to any individuals employed by or affiliated with Inari;

(e)    Any actual damages to the extent such damages are capable of calculation that AngioDynamics is entitled to recover in an amount to be proven at trial;

(f)    Exemplary damages as available and permitted by law;

(g)    Judgment against Bailey in the amount of AngioDynamics' reasonable attorney's fees and costs, as permitted by Paragraph 5(c) of the Confidentiality Agreement; and

(h)    Such other and further relief as this Court deems just and equitable.

## **JURY DEMAND**

AngioDynamics demands a jury on all issues so triable.

Respectfully submitted,

*s/ Sean C. Sheely*
Sean C. Sheely (NY Bar No. 2604684)
**HOLLAND & KNIGHT LLP**
31 West 52nd Street, 12th Floor
New York, NY 10019
212.513.3200
sean.sheely@hklaw.com

Nipun J. Patel (*pro hac vice forthcoming*)
Adria M. Lamba (*pro hac vice forthcoming*)
**HOLLAND & KNIGHT LLP**

Cira Centre
2929 Arch Street, Ste. 800
Philadelphia, PA 19104
215. 252.9600
nipun.patel@hklaw.com
adria.lamba@hklaw.com

*Counsel for Plaintiff AngioDynamics, Inc.*

Dated: September 16, 2022